UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Priscilla DeHotman

    v.                                          Civil No. 04-cv-114-JD

New Hampshire Department
of Corrections


O R D E R

Priscilla DeHotman brings a claim against her former employer, New Hampshire Department of Corrections, alleging violation of Title VII of the Civil Rights Act of 1964 due to a sexually abusive work environment that she contends caused her constructive discharge.  The Department moves for summary judgment on the grounds that it is not liable for the conduct at issue and that the conduct was not sufficiently severe or pervasive to be actionable.  DeHotman objects to the Department's motion.


Background

Priscilla DeHotman was hired by the Department as a correctional officer and began work at the Women's Prison in Goffstown on February 23, 2001.  As part of her training, she was assigned to work at the Men's Prison from March 16 to April 8, 2001, before she attended the Corrections Academy.  She attended

the Academy from April 9, 2001, through June 1, 2001, when she was again assigned to the Women's Prison.

During her assignment at the Men's Prison, DeHotman worked on the same shift with Corporal Douglas Tower.  Tower frequently invited DeHotman to go out for coffee after their shifts and offered to carpool with her, but she declined.  He followed her around while they were at work, and he would at times get close to her, gesturing and making sighing noises.  DeHotman found that Tower's behavior was sexually suggestive and offensive.  DeHotman discussed Tower's conduct with another female employee, who had similar experiences with Tower, but did not report his conduct to anyone else.

Beginning in June of 2001, DeHotman worked on the second shift at the Women's Prison, which runs from 3 p.m. to 11 p.m.  The second shift security staff members at that time were Sergeant Rita Fournier, Sergeant Lacerte, Corporal Gerard Lagasse, Corrections Officer Tina Furgal, Corrections Officer Tricia Ford, Corrections Tina Caza (Pettine), and DeHotman.[1]  Lacerte and Lagasse were the only male staff members on the second shift.  Nurse Jean Chapman also worked on the second shift.  While DeHotman was there,  Fournier moved to first shift;

---

[1]The parties did not provide Sgt. Lacerte's first name.

Lacerte was promoted to lieutenant and moved to first shift, and Sergeant Vincent Watts replaced Lacerte. Ford was promoted to corporal, and Corrections Officer Wanda Davis was added to the second shift staff. In addition, on January 4, 2001, Douglas Tower was promoted to sergeant and assigned to the second shift at the Women's Prison.

The second shift socialized together after work and tried to include DeHotman in their weekly gathering at Lagasse's home. DeHotman always declined their invitations, although she felt pressured to participate with them. DeHotman felt that the other staff members thought she was not a team player. She also heard about the socializing at work when the staff discussed their gatherings and drinking activities.

The second shift staff planned a brunch for Fournier in October of 2001 when she moved to the first shift. DeHotman was invited and was assigned to bring a fruit salad. She contributed to the gift, which was lingerie from Victoria's Secret, and signed the card for Fournier. The brunch was held at Lagasse's home, where the staff usually socialized. While Fournier opened her gifts, the staff, other than DeHotman, reminded her of the "rule" that she try on the lingerie. Fournier then put on the lingerie and modeled it for the staff. Furgal and Chapman also modeled the lingerie, and pictures were taken that were then

brought to work.  DeHotman was very embarrassed by the activities at the party.

In November of 2001, the second shift staff organized a Christmas party at a Chinese restaurant in Manchester.  Fournier told DeHotman that she was ordered to attend.  The staff exchanged gifts through a "Secret Santa" format.  Lacerte received edible underwear as his gift.  Lagasse put the underwear on DeHotman's head, which embarrassed and upset her, and a photograph was taken of her with the underwear on her head.  Lacerte then put the underwear on over his jeans, and two female staff members ate the underwear, while kneeling in front of him.  Lagasse stuffed dinner rolls into the front of his shorts.  When Chapman pulled on a lace jumpsuit she had received as a gift and began to get up on a table, DeHotman decided to leave.  Pictures of the activities at the Christmas party were brought to work.

After the Christmas party, DeHotman became more aware of the sexual overtones in conversations at work.  In one incident, Lacerte was standing next to DeHotman, and she asked him if he needed her for something.  He answered, "I do, but I'm married – you know, I'm already married."  DeHotman states that similar remarks and banter occurred all the time.

When DeHotman learned that Tower was being transferred to the second shift at the Women's Prison, she told Ford, Lagasse,

Fournier, and Lacerte that she could not work with Tower because he had sexually harassed her when she was in training at the Men's Prison. Fournier told DeHotman that she should put up with him and try to get reassigned to first shift. The others responded "that's just the way he is," that he was just stupid, and that he had "the Concord mentality." Despite her complaints, Tower joined the second shift with DeHotman. He immediately began asking her out, standing close to her and breathing heavily, making remarks about her, and following her around the prison. He asked her to go out for dinner on her birthday and wanted to bring a cake into work, but DeHotman declined. Tower brought cake in anyway.

On February 15, 2002, during a second shift briefing conducted by Tower, he referred to the second shift correctional officers as "my girls." DeHotman told him that his remark offended her, and he said, "Well, my kids." When DeHotman said that also offended her, he said, "All right. My bitches." At a subsequent briefing, Tower said that he was sorry if he had offended anyone, but then made comments about looking at inmates' and officers' breasts because their name tags were located above the left breast. Tower also attempted to read sexual jokes to DeHotman and when she walked away into the briefing room, he followed and continued to read the jokes during briefing. After

her complaint to Tower during the briefing on February 15, DeHotman felt that the other staff members thought she was not a team player.

During the same time period, DeHotman heard allegations from inmates that certain staff members were having sexual relationships with inmates. On Friday, February 22, 2002, DeHotman talked with Warden Gerry about what she had heard. The Warden asked DeHotman to speak with the inmates, write down their statements, and put the report in his mail box by Monday morning. One of the inmates was scheduled to be released Monday morning, February 25, 2002, and DeHotman had arranged to talk with her Sunday evening, February 24, 2002. No one else was aware of her assignment to gather information.

On February 24, 2002, toward the end of the second shift, Ford ordered DeHotman to accompany an inmate who was being transported to the hospital by ambulance. Because of her plan to meet with the inmate, DeHotman refused to go and told Ford to find someone else. DeHotman did not explain her assignment from the Warden but instead said she had to leave work by 11 p.m. because of another commitment after work. When Ford insisted that DeHotman make the ambulance run, DeHotman agreed to go but told Ford that she was quitting and cleaned out her locker. Ford reported the incident, recommending that DeHotman be terminated

for insubordination.

DeHotman was not scheduled to work on Monday February 25 and Tuesday February 26, 2002.  Fournier called DeHotman on Monday morning asking what had happened.  DeHotman told Fournier that she could not work at the prison anymore because Tower was sexually harassing her.  Fournier asked her to come back on Wednesday, and DeHotman agreed to come in.  When she arrived on Wednesday, she found that her name was not on the duty roster.  She then talked with the Warden and told him that Tower had been sexually harassing her and that the others were retaliating against her.  The Warden put his hands over his ears and said that he was only going to deal with the issue of her insubordination and nothing else.  The Warden gave her a letter of warning, which was placed in her file, and a three-day suspension without pay.  DeHotman's appeal of the discipline was denied.  DeHotman resigned on March 17, 2002.

## Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party.  See id. at 255.

## Discussion

DeHotman contends that she was sexually harassed during her employment at the New Hampshire Department of Corrections in violation of Title VII.  The Department seeks summary judgment on the grounds that the conduct was not sufficiently severe or pervasive to be actionable and was not perpetrated by a supervisor, that the off-duty socializing was not part of DeHotman's employment, that the conduct was not discriminatory, that no tangible or constructive employment action occurred, and that no retaliation claim has been alleged or could be proven. DeHotman provides no developed response to the issue of a retaliation claim, which is deemed to be waived, but otherwise objects to the Department's motion.

Title VII prohibits discrimination because of sex.  Oncale

v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-80 (1998). Sexual harassment in the workplace that is sufficiently severe or pervasive violates Title VII. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). To prove a Title VII claim of a hostile work environment due to sexual harassment,

> a plaintiff must establish: (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002).

A.  Employer Liability

The standard for employer liability depends on whether the hostile work environment was caused by a supervisor or a co-worker. Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005). If the plaintiff's supervisor is responsible, the employer is vicariously liable unless an affirmative defense is available. Lee-Crespo v. Schering-Plough, 354 F.3d 34, 43 (1st Cir. 2003). If the harasser is the plaintiff's non-supervisory co-employee, the employer is liable only "if the harassment is

causally connected to some negligence on the employer's part." <u>Noviello</u>, 398 F.3d at 95.

The Department contends that none of the people involved in the sexual conduct cited by DeHotman was a supervisor within the meaning of the Title VII. For purposes of Title VII, supervisory status depends on whether the person has "the authority to affect the terms and conditions of the victim's employment," which "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." <u>Id.</u> at 96 (internal quotation marks omitted). In contrast, supervisory nomenclature or authority to direct work-related tasks are insufficient alone to show supervisory status. <u>Id.</u>

In this case, it is undisputed that many of the people involved in the objectionable conduct held ranks higher than DeHotman. She was subject to their directions and orders in the course of her work. The circumstances of this case also show that failure to comply with the orders of a superior officer could result in charges of insubordination and a recommendation of discipline, including termination. The Department establishes, however, through the affidavits of the Warden and the Department's Human Resources Administrator, that none of the employees involved in the conduct DeHotman describes, despite their ranks as corporal, sergeant, and lieutenant, had authority

to hire, fire, transfer, demote, promote, or discipline a correctional officer such as DeHotman.  DeHotman provides no evidence to the contrary.  Therefore, no material factual dispute exists as to whether any of the employees involved in the conduct pertinent to this case, other than the Warden, were supervisors.

B. Off-Duty Conduct

The Department argues that the conduct that occurred at the two parties cannot be considered as part of the harassment or hostile work environment because it did not occur in the workplace.  Contrary to the Department's argument, courts have not drawn a bright line between harassment that occurs in the workplace and harassment that continues outside of the workplace for purposes of considering a Title VII claim.[2]  See, e.g., Reed v. MBNA Marketing Sys., Inc., 333 F.3d 27, 30 (1st Cir. 2003) (including incident at harasser's home as part of actionable conduct); Crowley, 303 F.3d at 307-99 (describing harasser's conduct outside of work as part of actionable conduct); see also

---

[2] The Department's argument is based largely on P. v. Delta Air Lines, Inc., 102 F. Supp. 2d 132 (E.D.N.Y. 2000), which was reversed by Ferris v. Delta Air Lines, Inc., 277 F.3d 128 (2d Cir. 2001), where the court held that "[i]t does not follow, however, that the off-duty nature of the rapes absolved Delta of all responsibility to take reasonable care to protect co-workers . . . ." Id. at 137.

Ferris, 277 F.3d at 137; Dowd v. United Steelworkers of Am., Local No. 286, 253 F.3d 1093, 1102 (8th Cir. 2001); Cromer-Kendall v. District of Columbia, 326 F. Supp. 2d 50, 59 (D.D.C. 2004); Parrish v. Sollecito, 246 F. Supp. 2d 342, 350 (S.D.N.Y. 2003). Therefore, the conduct at the two parties is not excluded simply because it occurred outside of the workplace.

C.  Harassment Based upon Sex

Title VII does not provide a general civility code or prohibit all verbal or physical harassment in the employment context. Oncale, 523 U.S. at 80. To be actionable, the challenged conduct must be based upon the victim's gender, meaning that the harassment must expose members of one sex "to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. (internal quotation marks omitted).

It is undisputed that both men and women participated in the sexually suggestive conduct at the two parties. Their conduct was not particularly aimed at DeHotman. Tower did not attend either of the parties. Nothing in the record presented here suggests that the conduct at the two parties exposed DeHotman to conditions of employment, because she is female, that male employees did not experience. Her concerns about the clique

12

mentality of her fellow employees does not show discrimination based on her gender. Therefore, the conduct at the parties is not actionable as sexual harassment.

D. <u>Severe and Pervasive</u>

DeHotman contends that she was sexually harassed by Tower both while she was a trainee and when Tower was assigned to the second shift at the Women's Prison in January of 2002. To be actionable under Title VII, plaintiffs "must show harassing behavior sufficiently severe or pervasive to alter the conditions of their employment." <u>Penn. State Police v. Suders</u>, 124 S. Ct. 2342, 2346 (2004). The Department argues that Tower's conduct does not meet that standard. While the record does not strongly support DeHotman's claim, there is enough evidence to allow a jury to decide whether Tower's conduct was sufficiently severe or pervasive to constitute sexual harassment.

E. <u>Constructive Discharge</u>

DeHotman also contends that the Department violated Title VII by causing her constructive discharge. To prove that claim, DeHotman must show that both that the harassment was sufficiently severe or pervasive to meet the Title VII standard for discrimination and the "working conditions [were] so intolerable

that a reasonable person would have felt compelled to resign." Suders, 124 S. Ct. at 2354 (internal quotation marks omitted). In addition, the offending behavior leading to a constructive discharge must discriminate against the plaintiff because of her gender. Lee-Crespo, 354 F.3d at 44 n.5.

In her resignation letter, DeHotman listed several reasons for her decision to resign. Although sexual harassment by Tower was one of the reasons, it was not the only reason. The insubordination charge and resulting discipline, a lack of attention to her allegations of misconduct by prison staff with inmates, and what DeHotman perceived as a hostile work environment were listed as equally important reasons. DeHotman said that Tower's harassment had "subsided for a short period, but has changed very little and is still as offensive."

The problems DeHotman cites, aside from Tower's harassment, were not gender-based and cannot be considered as part of her constructive discharge claim. While Tower's conduct, as described in the record, may be enough to support a claim of sexual harassment, that conduct, by itself, was not the reason DeHotman resigned and is not sufficient to show that her working conditions were so intolerable that any reasonable person would have resigned. In fact, DeHotman did not find it necessary to resign until after the insubordination incident and her concerns

14

arose about the Warden's response to her allegations of misconduct by staff with inmates.  Therefore, the Department is entitled to summary judgment to the extent DeHotman's claim is based on a constructive discharge theory.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (document no. 8) is granted in part, to the extent the plaintiff's claim was based on theories of retaliation, constructive discharge, or a hostile environment due to conduct at two parties, and is otherwise denied.  Therefore, the plaintiff's claim is limited to a theory of sexual harassment by Sgt. Tower.  With the issues raised for summary judgment resolved, the parties should now use their best efforts to reach a settlement.  The plaintiff's motion to seal (document no. 10), to which the defendant filed no objection, is granted.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

June 3, 2005

cc:   Michael J. Sheehan, Esquire
      Nancy J. Smith, Esquire